Lee, J.
It appeared from the report of the commisssioner made in the progress of this cause, that the assets of the estate of John Crawford deceased, other than the property specifically devised and bequeathed by the will of the decedent, were insufficient for the payment of the debts due from the estate, by the sum of 5502 dollars 84 cents; and the question arose how this deficiency was to be supplied. The chancellor was of opinion, and by the decree of the 5th of February 1834, in effect held, that it should be charged equally and ratably upon the land, the slaves and other property disposed of by the will. In this, the appellant alleges the court erred. He insists that the personal estate is the natural fund for the payment of debts, unless the rule be changed by the will of the testator, for which the general charge contained in that of the decedent in this case for payment of debts does not suffice; and that the assets should have been so marshaled that the slaves and other personal property should first have been applied to supply the deficiency before any portion of the proceeds of the sale of the real estate should have been withdrawn for that purpose.
The order in which the different funds or subjects of property constituting the estate of a deceased testa *549 tor, and which are liable to the payment of debts, will be applied, seems to be pretty clearly settled by the various adjudications that have been made upon the subject. The first to be so applied, is the personal estate at large not exempted by the terms of the will or necessary implication. Next to it, real estate or an interest therein expressly set apart by the will for payment of the debts. Next, real estate descended to the heir. After it, property, real or personal, expressly charged with payment of debts, and then subject to such charge, specifically devised or bequeathed. If these prove inadequate, then general pecuniary legacies, and after them, specific legacies, both classes ratably; and in the last resort, real estate devised by the will. 2 Jarman on Wills 546, and authorities cited; 4 Kent’s Com. 420, et seq.; 1 Story’s Eq. Jur. § 577. Subject to the modification indicated by this classification, and in the sense which it explains, it is the general rule that the personal estate is the primary fund for the discharge of the debts, and is to be first applied and exhausted, even in payment of debts for which the real estate may be expressly charged by mortgage. Co. Litt. 208 b., note 106; Howel v. Price, 1 P. Wms. 291 ; Cumberland v. Codrington, 3 John. Ch. R. 224, 257; King v. King, 3 P. Wms. 358. That the devisee of real estate not charged with the payment of debts, is entitled to have the assets marshaled against the claimants of the other funds of the estate in the order stated, including specific legatees, is well settled by the authorities. 2 Jarman on Wills 601; Clifton v. Burk, 1 P. Wms. 678 ; Forrester v. Leigh, Amb. R. 171; Scott v. Scott, 1 Eden’s R. 45S; Keeling v. Brown, 5 Ves. R. 359 ; Mirehouse v. Scaife, 2 Mylne & Craig 695, 14 Eng. Ch. R. 696. In the case of Long v. Short, 1 P. Wms. 403, it would seem to have been held that specific legatees and devisees of real property not charged with payment of debts, were *550 bound to contribute ratably for payment of debts due by specialty. But tbe authority of this case has been greatly doubted; 2 Jarman 547 n, b; and it would appear to be greatly shaken, if not entirely overthrown by the cases just cited, and especially the case of Mirehouse v. Scaife, 2 Mylne & Craig 695, in which the distinction endeavored to be maintained between specific and residuary devisees is utterly repudiated, and the principle applicable to both held to be identical.
■ This exemption of real estate devised extends as well to the case of a deficiency of personal assets for .the payment of legacies as of debts; the legatees having no right to call upon the devisee to contribute to the payment of their legacies, unless the real estate be expressly charged. Hayes v. Leaver, 2 Jarman on Wills, 547 n.
But in either case the right thus asserted on the part of the devisee to hold the estate devised, as against the legatees, free from liability for debts or legacies, is to be confined to the case of a devise of real estate not charged with the payment of debts or legacies; for it is equally clear that where the estate devised is so charged, it is applicable before legacies, and the legatees have the right to have the assets marshaled in their favor. The legacies not being charged with the payment of debts while the real estate devised is so charged, the legatees will be regarded as more the objects of the testator’s bounty than the devisee; and where the personal estate is not sufficient to pay both the creditors and the legatees, the latter will be entitled to charge the real estate devised so far as the personal estate had been applied in payment of debts. Foster v. Cook, 3 Bro. C. C. 347 ; Lutkins v. Leigh, Cas. Temp. Talb. 53; Forrester v. Leigh, Anb. R. 171; Norman v. Morrell, 4 Ves. R. 769 ; Aldrich v. Cooper, 8 Ves. R. 381, 396; Livingston v. Livingston, 3 John. Ch. R. 148, 153. Nor is there any *551 distinction in this regard between specific legatees and pecuniary legatees, the right to marshal the assets in the case supposed being affirmed equally in favor of the latter as of the former. Forrester v. Leigh, Amb. R. 171: Wythe v. Henniker, 2 Myl. & Keene, 365, 8 Cond. Eng. Ch. R. 162.
The principle which lies at the foundation of the right of a legatee or devisee to marshal the assets, is as has been intimated, the presumed intention or inclination of the testator in his favor. But where, as in the case now in judgment, the testator has charged his whole estate, as well the real property devised as the personal bequeathed, with the payment of his debts, there can be no stronger presumption of an inclination In favor of the devisee than of the legatee, both being equally the objects of the testator’s bounty; and between persons so taking, equity will not Interfere unless the testator has shown clearly some ground of preference or priority of the one over the other. 1 Story’s Eq. Jur. § 565. And if in such a case the property other than that specifically devised and bequeathed, prove inadequate to meet the charge, it should seem that equity to supply the deficiency, would apply its maxim that equality is equity, and levy it equally and ratably upon the property so devised and bequeathed. The principle of contribution in such a case for the purpose of meeting the common charge resting alike upon the different subjects of property disposed of among the several objects of the testator’s bounty, is dictated by a plain and obvious rule of justice, and is, I think, fully ■sanctioned by authority. In the case of Carter v. Barnadiston, 1 P. Wms. 505, the testator being seized in fee of two different manors, by his will charged all Ms real estate with the payment of Ms debts, and devised the two manors to different persons. He afterwards mortgaged one of these manors to secure the payment of the sum of 4,000 pounds and interest, and then died. *552 The lord, chancellor held that the devisee of the mortgaged manor was entitled to call upon the devisee of the other, to contribute to the payment of the mortgage debt. So in the case of Heveningham v. Heveningham,2 Vern. R. 355, (also stated in 1 Eq. Cas. Ab. 117,) where the testator charged his real estate with the payment of his debts, and then devised different portions to several persons, it was held that the devisees should contribute ratably according to the value of the respective subjects devised to them, to satisfy the charge. The same principle is recognized in the cases of Growcock v. Smith, 2 Cox’s Cas. 397, and Harris v. Ingledew, 3 P. Wms. 98, (both cases of a devise of freehold and copyhold estates charged with payment of debts,) and also in the opinion of the lord chancellor in the case of Aldrich v. Cooper, 8 Ves. R. 381, and in Livingston v. Livingston, 3 John Ch. R. 148. And there is no distinction mentioned between the case of a charge by will upon real estate only and where the estate charged consists of personal as well as real estate. In both cases the doctrine is the same; and it seems to be settled that although personal property is applicable in payment of debts before real property, when neither species is expressly charged by the terms of the will, yet when both are equally and expressly charged, they stand on the same footing, and each must contribute its ratable share towards the common burden.
The distinction between the natural or primary fund for the payment of debts and other and auxiliary funds to be only so applied when necessary, is not here admitted; the intention imputed to the testator being to place all the objects of his bounty on equal terms, and to distribute the burdens as well a§ the benefits equally and ratably among them. Thus in the case of Irvin v. Ironmonger, 2 Russ. & Myl. 531, (13 Cond. Eng. Ch. R. 157,) the testator charged all *553 Ms property with, the payment of his debts, and subject to the charge, disposed of the estate consisting of freehold, copyhold and leasehold, and personal’property, among different persons. The master of the rolls, Sir John Leach, held the legatees and devisees should contribute ratably to the common charge. And the same principle was affirmed in the case of Chase v. Lockerman, 11 Gill. & John. 185, where it was adjudged that devisees and specific legatees should contribute ratably for the payment of debts due by specialty; otherwise in respect to debts due by simple contract, the legatees not being entitled to call upon the devisees to contribute to them. In the case of Roberts v. Walker, 1 Russ. & Mylne 752, (4 Cond. Eng. Ch. R. 644,) the testatrix by her will created a mixed and general fund from the proceeds of real and personal estate, and directed that fund to be applied in payment of debts and legacies. And one of the questions raised in the case was whether the debts and legacies should be paid out of the personalty as far as it would go, to the exemption of the real estate, or whether they should be charged upon the real and personal estate proportionally. Sir John Leach, master of the rolls, held that in such a case a testator must be regarded as in effect directing that the real and personal estates out of which the general fund has been raised, shall answer the prescribed purpose for which it was raised, pro rata, according to their respective values. TMs same doctrine is held m the case of Kidney v. Coussmaker, 1 Ves., jr. R. 444, in which Lord Thurlow says, that where a testator combines real with personal estate generally, the burdens of the personal estate would be also placed upon the estate combined with it; and he adds that “ there are many cases for that.” The principle of these cases is also recognized in the cases of Stocker v. Harbin, 3 Beavan R. 479 ; Salt v. Chattaway, 3 Beavan R. 576 ; *554 (cited 2 Jarman on Wills 551, 552,) and Adams v. Brackett, 5 Matc. R. 280. In the case last cited, although the court thought that the real and personal estate were not so blended and combined as to create a charge on the real estate devised by the will of the testator, yet it is distinctly admitted that where they are blended and combined, what is a charge upon the one is a charge upon the other; and the real estate must bear a proportionate share of the burden. In the case of Dunk v. Fenner, 2 Russ. & Mylne 557, 13 Cond. Eng. Ch. R. 170, the court held that the testator had blended the real and personal estate into a common fund, and charged it with the declared purposes of the will; and that the annuity and legacies given by the will should be charged upon and paid out of the real and personal estate in proportion to their respective values.
The only case I have found that I deem irreconcilable with the doctrine of the cases to which I have referred, is that of Hoye v. Brewer, 3 Gill. & John. 153, in which the court seem to have gone upon the assumption that although both the personal and real estate be expressly charged with the payment of debts, yet the personalty must first be exhausted before the land ean be made liable. But, whatever respect may be due to this decision, I yet think the reason and justice of the case and the weight of authority are the other way.
In what I have said I have treated the case as if it were of a devise of the real estate by the testator John Crawford, in specie. But it is to be observed that he does not give the land itself to Mrs. Carter and her son John Elliott, the appellant, but he directs it to be sold, and the proceeds to be equally divided between them. And this serves somewhat to throw light upon what is to be regarded as the intention of the testator. The slaves he bequeaths specifically, one-half *555 to Mrs. Carter and the appellant and the other half to John 0. Burras. And, upon my first examination, I thought it worthy of consideration whether there was . not an intention manifested to exempt the slaves from any liability to debts. Further reflection has, however, satisfied me that under the rules furnished by the adjudicated cases for the solution of such a question, there is no sufficient indication of the intention of the testator to exempt the slaves or any part of the estate from liability to the debts; and that in providing for the deficiency of the assets, other than the property devised and bequeathed by the will of the testator, to pay the debts due from the estate, it was just and proper to levy for it equally and ratably upon the land, the slaves and the other property disposed of by the will. I am of opinion, therefore, that there is no error in the decree in this respect.
The appellant next complains that the court erred in the decree of the 19th of May 1838, pronounced on the rule sued out against the executors of John Crawford deceased, under the reservation contained in the decree of the 5th of February 1834, in not holding the executors liable for the original amount of the purchase money of the parcel of land conveyed to Bichard Eubank, after deducting the amount which it brought at the sale made under the decree in the chancery cause, instituted to subject it to the purchase money remaining unpaid. It appears that on the 12th of November 1818, the executors of John Crawford deceased, by virtue of the power given them by the will, made sale of the real estate of their testator at public auction, at which a tract of 320 acres was knocked off to one William Pryor upon a credit; that on the same evening, and before the sale to Pryor was further effectuated, by agreement of the parties, one Bichard Eubank was accepted and received as the purchaser of 199|- acres of the tract cried off to Pryor, *556 and it was agreed that when that portion of the land should be laid off by a survey, the said Eubank was to give his bonds, with security for the amount of the purchase money. In the following spring, to wit: On the 24th of April 1819, the survey having been made in the mean time, the said Richard Eubank executed his bonds, with John M. Eubank as his surety, for the purchase money; the said bonds being payable at different times, and the one last payable, falling due on the 1st of June 1822 ; and a deed of conveyance appears to have been executed at the same time by the executors, to the said Richard Eubank for the land, though it was not produced for record till the 2d of August 1824. Of these bonds, that first falling due was paid; upon the second and third, a suit was brought, judgment obtained and executions issued, which were returned “no effects.” Upon the fourth bond (that falling due latest) no suit was brought; the said Richard Eubank and his surety John M. Eubank, having become in the mean time insolvent, and a suit upon that bond being deemed a useless experiment. But in October 1822, a bill in chancery was filed, seeking to assert a lien upon the land for the unpaid purchase money.
In February 1836, after a protracted litigation, the pretensions of the complainants in this cause were sustained by the court, and a decree pronounced, directing a sale of the land by a commissioner for the purpose of raising the balance of the purchase money. A sale took place, yielding only the sum of 467 dollars 75 cents net, to be applied to the debt, and leaving a balance of the purchase money still unpaid. For this balance the appellant contends that the executors of John Crawford should be held responsible, insisting that their release of Pryor, the original purchaser, a highly responsible man as they considered, and their accepting Eubank, a less responsible man in his stead, *557 and their failure to take from Eubank an exjiress lien for the purchase money when they executed a conveyance to him for the land, constituted such neglect of duty as amounted to an abuse and breach of the trust confided in them, and that they should be held to make good the loss which has followed.
It is not easy to say in a great variety of cases what the precise duty of a trustee is; and the acts and omissions for which a trustee will be held responsible as for violations of the trust reposed, have not been classified or defined with any great accuracy or precision. In a general sense a trustee is bound by his implied obligation to perform all those acts which are necessary and proper for the due execution of the trust which he has undertaken. But as he is supposed to take upon himself the trust as a matter of honor, conscience, friendship or humanity, and according to the general doctrine on the subject, is not entitled to any compensation for his services without some stipulation to that effect, he would seem to be upon principles analogous to those applicable to the law of bailments, bound only to good faith and reasonable diligence, and as in the case of a bailee without reward, liable only for gross negligence. 2 Story’s Eq. Jur. § 1268. With regard to the rules by which trustees should be governed in the management of trust funds, the laying out of money in securities, or allowing trust money to remain in the hands of those from whom it is owing, Lord Hardwicke remarked, (Ex parte Belchier, Amb. R. 219,) that these rules should not be laid down with such strictness as to strike terror into mankind acting for the benefit of others and not their own. In the case of Knight v. Lord Plimouth, 3 Atk. R. 480; S. C. 1 Dickens’ R. 126, the same learned judge says : “ Suppose a trustee having in his hands a considerable sum of money places it out for the benefit of the cestui que trust, in the funds which afterwards sink in their value, or on *558 security at the time apparently good, but which after-wards turns out not to be so, was there ever an instance of a trustee being made to answer for the actual sum so placed out ? I answer, no. If there was no mala fides, nothing wrongful in the conduct of the trustee, the court will always favor. For as a trust is an office necessary in the concerns between man and man, and which if faithfully discharged is attended with no small degree of trouble and anxiety, it is an act of great kindness in any one to accept of it. To add hazard or risk to that trouble, and to subject a trustee to losses which he could not foresee would be a manifest hardship, and would be deterring every one from accepting so necessary an office.” These observations are cited with approbation by Judge Story, (2 Eq. Jur. § 1272,) though he adds that it would be difficult to affirm that the courts of equity have always proceeded upon so broad and liberal a basis. Chancellor Kent also in the case of Thompson v. Brown, 4 John. Ch. R. 619, 628, expresses his concurrence in them, and he declares that where there is no just imputation of mala fides, and the fault is at most but an error of judgment and a want of sharp sighted vigilance, it would have the appearance of great rigor, and be hardly reconcilable with the doctrines of the court to hold a trustee responsible : And he adds, that that court had always treated trustees acting in good faith with great tenderness. So in the case of Hart v. Ten Eyck, 2 John. Ch. R. 62, the same chancellor speaks of the defendants as administrators and trustees who by the nature of their undertaking were charged with the execution of disinterested and burdensome trusts : And he adds that he should always be extremelv..averse to hold such characters responsible on slight grounds where there is evidence of fair and upright intention ; but if the facts necessarily lead to the conclusion that they had been guilty of gross negligence or of premeditated and *559 fraudulent concealments and dispositions of the trust funds, it would he his duty to animadvert upon such conduct with the freedom and severity due to truth and justice. The cases of Wilkinson v. Stafford, 1 Ves. jr. R. 32, and Vez v. Emery, 5 Ves. R. 141, may also be referred to as supporting the proposition that trustees acting with reasonable care and prudence, and with the best judgment they can form upon the occasion, will be protected notwithstanding an unforeseen loss of the trust subject. And to the same effect is the opinion of the master of the rolls in the case of Powell v. Evans, 5 Ves. R. 839, in which he declares that the court should act with great tenderness towards executors who are called upon to execute often onerous and difficult trusts, and are entitled to great indulgence unless neglect be fully proved: And he added, that he was greatly averse to charge executors who intended fairly to discharge their duty; and that he was very cautious not to hold them liable upon slight grounds. Many other cases and opinions of learned judges might be cited tending to the same conclusions; and the fair result of the views which they present and the reasoning they adopt is, that where a trustee has acted in good faith in the exercise of a fair discretion, and in the same manner in which he probably would have acted if the subject had been his own property and not held in trust, he ought not to be held responsible for any losses accruing in the management of the trust funds.
In Virginia it is true, for the most part, some compensation is allowed to executors and other trustees for their services, yet I am not aware that any different or more stringent rule has been adopted by which the measure of their responsibilities is to be determined, than that which seems to prevail in the chancery of England and New York; and I very much doubt whether a wise policy should ever require more of a trustee than that he should act in good faith and with *560 the same prudence and discretion that he is accustomed to exercise in the management of his own affairs. A trust is an office of honor, confidence and friendship; and if more than what I have indicated were required of the trustee, it would cease to be of that character, and would become one of hazard, speculation and profit; and the evils and inconveniences alluded to by the learned judges whose opinions I have before cited, would speedily be realized. As at present advised, therefore, I should not feel disposed to extend the responsibilities of trustees beyond the limits by which they would seem to be bounded in the cases to which I have referred; and where they have intended to discharge their duties fairly, I think they should be treated with tenderness, and due caution taken not to hold them liable upon slight or uncertain grounds, lest, by a different policy, men of integrity and who would be actuated by the proper views, may be deterred from taking upon themselves an office so necessary in the concerns of life, from fear of the anxiety, trouble and risk which it involves.
In the case under consideration there is not the slightest ground upon which to impute anything like mala fides on the part of the executors in the transaction now called in question. After the land had been cried off to Pryor at his bid, during the same day and before the sale had been carried into effect by the execution of the bonds required of the purchaser, while the transaction was thus in fieri and incomplete, the executors acquiesced in an arrangement by which, as to 199 J acres of the tract bid in by Pryor, Richard Eubank was allowed to take the place of Pryor as the purchaser thereof; and subsequently, for a proportionate part of the purchase money, his bonds were accepted by the executors with John M. Eubank as his surety; and the transaction was treated as a sale by the executors of the 199£ acres directly to Richard *561 Eubank. Substitutions of this character of a third person in the place and stead of the actual bidder at sales made by executors, commissioners and other - trustees, are of very common occurrence; and if the bonds of the third party so substituted, with the sureties offered by him, be such as the trustee making the sale would, under the surrounding circumstances, be justified in receiving if he were himself the actual bidder, I do not perceive any well founded objection to the transaction. If the executors had refused to acquiesce in the proposed arrangement, and Pryor had then refused to complete his purchase by giving his bonds with security, (instead of those which he tendered of the Eubanks,) the alternative left to them would have been either to bring a suit in chancery against Pryor to enforce a specific performance of the contract, (a measure of doubtful expediency,) or to put up the land again for sale: And if the latter course were adopted, and Eubank had become the purchaser at the same price at which it was struck off to Pryor, the result would have been just the same. Now, in such a case, I do not think it can be doubted upon the evidence that the executors would have been justified in receiving the bid of Eubank, and accepting his bond with John M. Eubank as his surety for the purchase money. The testimony proves that at the time of this transaction both Richard Eubank and John M. Eubank were in thriving circumstances and in good credit; and that for the amount of the purchase money of this land they could have got credit as readily as any men in the neighborhood, and no one who was acquainted with them would have hesitated to trust them for that amount. The effort to prove that these men were, or were deemed to be, unworthy of credit for the amount in question at the time of the sale has, I think, entirely failed ; and I think it cannot be doubted that the executors thought at the time that *562 Richard Eubank and John M. Eubank were abundantly good for the amount; and the property of which they were in possession and their general reputation in the neighborhood justified them in so believing. Had the land been their own instead of a trust subject, they would have doubtless done as they did, and so would most other men in the community. It turns out, however, that they were mistaken; that those parties were not entitled to the high credit which they enjoyed, and they failed before this debt could be collected. But to make the executors liable for this mistake would be a harsh measure, and not in consonance with the spirit usually manifested in the court of chancery towards fiduciaries under such circumstances.
But it is said the failure of the executors to take a specific lien upon the property for the purchase money to be paid by Eubank was such a breach of duty as to render them chargeable. I am aware that upon this subject a somewhat strict rule has been laid down in some of the cases in the English chancery: Adye v. Feuilleteau, 1 Cox’s R. 24; Ryder v. Bickerton, 3 Swanst. R. 80; Holmes v. Dring, 2 Cox’s R. 1. Though in the case of Harden v. Parsons, 1 Eden’s R. 145, Lord Horthington advanced a more liberal doctrine, holding, as he did, that a lending of trust moneys on personal security only was not per se such gross negligence as to amount to a breach of trust; and that to charge a trustee, other circumstances crassee negligent-ice, must be shown; and in Smith v. Smith, 4 John. Ch. R. 281, Chancellor Kent expresses the opinion that there may be cases in which a trustee would be exonerated by taking personal security. And if in this case the failure of the executors to take an express lien on the property had in fact prevented a resort to it as a security for the debt, I should have felt more difficulty in holding the executors excused, for such an omission. *563 But it is to be observed it had not that effect; for though the executors did execute and tender a deed for the land they considered as embraced within Eubank’s bounds, yet they claimed that that deed never was accepted by Eubank, and that the legal title still remained in them. And this is rendered probable by the fact that a negotiation and agreement took place between Eubank and the executors, by which the latter agreed to make to Eubank another and an unexceptionable deed for the land, and Eubank agreed to execute a deed of trust upon it at the same time for the unpaid balance of the purchase money. These deeds were accordingly prepared, and the parties met for the purpose of executing them. They disagreed, however, and Eubank refused to execute the deed of trust according to the agreement, and so the matter stood. Another circumstance tends to confirm the statement of the executors; which is that, although the deed tendered to Eubank and to which he objected because it omitted, as he alleged, a small piece of land to which he thought he was entitled, was executed in 1819, yet it was never produced by Eubank for record till 1824, some time after the suit brought against him by the executors to subject the land, and in which they alleged that this deed had not been accepted. How this may have been, however, or what were the views taken of the case by the court, it is not material to examine or consider; for certain it is, the court did sustain the pretensions of the executors, and by its decree pronounced on the 2d of February 1836, held that there was a lien upon the land sold to Eu-bank for the unpaid purchase money, and directed it to be sold, (though “ subject,” as the decree expresses it, “to the contingent right of dower of the wife of the said Richard Eubank,”) and the proceeds applied to the discharge of the same. Thus the failure of the executors to take a direct lien upon the land *564 did not occasion a loss of such security as it could afford, because it was actually still held bound for and sold to raise the purchase money. It is true it brought at the sale comparatively a small sum, leaving a large balance still unpaid, owing, as the appellant contends, to the great delay which had taken place during a protracted litigation, the depreciation of the value of the property in the mean time, and the supposed outstanding incumbrance of the contingent right of dower in the wife of Eubank, subject to whieh the sale was directed to be made. But I think it can scarcely be reasonable or just to visit upon these executors the consequences of delay proverbially incident to all litigation, as it does not appear to have been attributable to any neglect or failure on their part to prosecute the suit with proper diligence; and indeed we see that from some period either during or prior to the year 1831 their authority to act, and control over the subject, had ceased in consequence of their powers as executors having been revoked, and Dawson, the sheriff of Amherst, substituted in their place as administrator. Still less would it be right, as I think, to hold them responsible for the act of the court in directing the sale to be made subject to the supposed contingent dower right. That the wife of Eubank could assert no right to dower in this land to the prejudice of the vendor’s lien, may be affirmed under the authority of the case of Wilson v. Davisson, 2 Rob. R. 384; but if the court erred in directing the sale to be made subject to such supposed right, it was a matter which the executors could neither control nor correct, even if they had not long before the decree ceased to be parties to the cause by the substitution of Dawson’s name as that of plaintiff in place of theirs.
Upon the whole, after the fullest reflection that I have been enabled to bestow on the subject, although *565 I have not found myself entirely free from doubt, I have yet come to the conclusion that under all the circumstances disclosed in this case, it would be, perhaps, harsh and rigorous, and not in consonance with the mild spirit and liberal principles which have prevailed in the courts of equity in expounding the duties and measuring the liabilities of fiduciaries, to require these executors to make good out of their private estates, the loss which has unfortunately occurred in the administration of this trust subject. I think, therefore, the Circuit court did not err in discharging the rule sued out by the appellant seeking to-fix such liability upon them.
The third ground of error assigned is, that the decree of the 22d of May 1838 improperly saddles the loss of so much of the purchase money of the Eubank land as could not be made, wholly upon the petitioner, which is alleged to be unjust and in violation of the will of the testator. This objection is evidently founded upon a mistake in point of fact, or a misapprehension of the purport and effect of the decree. Eor it declares that the court is inclined to the opinion that the whole loss should not fall upon the appellant, but that the proceeds of the lands devised to Elizabeth Carter, his codevisee, should lose one moiety. It is also declared to be the opinion of the court, that it would be unjust that Elliott should be made to abate ratably and in proportion with his colegatees and devisees and at the same time to charge upon him an additional sum for the lost land money, which it was stated was the effect of the commissioner’s report. And the court was further of opinion it would not be just that the deficiency should be visited wholly on Mrs. Carter and Elliott, the devisees of the realty, but that it should be borne ratably and in proportion to value of what each actually received from the estate of the testator, together with the defendant *566 John C. Burras. The commissioner was accordingly directed to restate the accounts according to the principles thus indicated, and also to state a further account as between the devisees of the real estate, with a view to a final settlement of the whole. But as explained by the counsel, this objection to the decree of the 22d of May 1838 is claimed to be well taken, because it repeats the supposed error in the decree of the 5th of February 1834, of rating the real estate with any portion of the debts of the testator. In this view, this objection has been already fully considered on the first ground of error assigned, and I have nothing further to add to the already too protracted observations on that subject.
The remaining ground of error assigned is the omission of the commissioner in his report of the 30th of August 1832, to bring into the account the balance found to be due from the executor William Jopling, and also the balance found to be due from the executors Abraham Carter, Joseph R. Carter and William Jopling, jointly, upon the account stated in the case of Camden v. Jopling, which account he professes to adopt and make the basis of his report. But I do not think it material to stop to consider this objection, because if found to be well taken it should not lead to a reversal of either of the decrees, inasmuch as under the broad terms of the order directing the accounts to be recast there is ample room and verge enough to supply any such omissions as those complained of or to correct any errors apparent on the face of the former report.
The defendant John C. Burras in the Circuit court took numerous exceptions to the report of the commissioner, all of which were overruled by the court. The counsel for the appellant here has elaborately examined these exceptions, contending that they were all properly overruled, because, as he has explained, if *567 the court should reverse the decrees complained of, it would be to the prejudice of Burras, and the court would then go on to correct any errors against him that may appear to have been committed. But as Burras has not appealed from the decrees affecting him, and as in the view I take of the case the relations in which he stands to the other parties as settled by those decrees, are not to be disturbed by the reversal of either of them, I think this court is not called upon to pass upon his exceptions to the report, and I therefore dismiss them without further remark.
I am of opinion that the decrees of the 22d and the 19th May 1838, and that of the 5th February 1834, should all be affirmed, with costs to the appellees.
Allen and Moncure, Js. concurred in opinion with Lee, J.
Samuels, J. dissented.
Decree affirmed*,